UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:  9/26/2016
```

------------------------------------------------------------X
O.F.I. IMPORTS INC., a California corporation,  :
  :
                     Plaintiff,  :
  :
         -against-        :       15-CV-7231 (VEC)
  :
GENERAL ELECTRIC CAPITAL      :       OPINION AND ORDER
CORPORATION, a Delaware corporation; and  :
DOES 1-20, inclusive,  :
  :
               Defendants.  :
------------------------------------------------------------X

VALERIE CAPRONI, United States District Judge:

Plaintiff, O.F.I., Imports, Inc. ("OFI"), has sued General Electric Capital Corp. ("GE Capital") and twenty unnamed individual defendants for fraud, unfair competition, and deceptive acts in connection with OFI's purchase of frozen food and other assets originally owned by Contessa Premium Foods, Inc. ("Contessa"). OFI alleges that GE Capital and its agents provided OFI with false documentation regarding Contessa's inventories and accounts receivable, causing OFI to purchase the Contessa assets for approximately $5.64 million more than their actual value. GE Capital has moved to dismiss Plaintiff's First Amended Complaint, Dkt. 51 (the "FAC"). GE Capital contends that all of OFI's claims are barred by the disclaimer and release language contained in the documentation for the Contessa transaction, and that, even if the release is invalid, OFI has not plausibly stated several of the elements of each cause of action. For the reasons that follow, GE Capital's Motion to Dismiss is GRANTED, and the FAC is DISMISSED.

## BACKGROUND[1]

### I.   OFI's Purchase of the Contessa Assets

Plaintiff purchased "virtually all" of Contessa's assets in late May 2014.  FAC ¶ 13.  At the time of the transaction, Contessa was in the process of liquidating through an "assignment for the benefit of creditors" pursuant to California law.  FAC ¶ 10.  GE Capital was Contessa's primary secured creditor and, according to the FAC, "wholly in control of the liquidation and ultimate disposition of Contessa's assets."  FAC ¶ 20.  OFI, GE Capital, and Contessa's liquidator, Development Specialists, Inc. ("DSI"), negotiated the sale of Contessa's assets to OFI over the course of several weeks in May 2014.  FAC ¶¶ 13, 19.[2]  On May 19, 2014, DSI and OFI entered in to an asset purchase agreement (the "APA") pursuant to which OFI agreed to pay approximately $21 million for Contessa's remaining inventories, accounts receivable, and other assets.  *Id.* ¶ 13.  Two days later, on May 21, 2014, GE Capital and OFI entered into a credit agreement (the "Credit Agreement") pursuant to which GE Capital provided OFI with a revolving credit facility intended, in part, to finance the Contessa purchase.  *Id.* ¶ 23.

The negotiations regarding OFI's purchase of the Contessa assets were led by OFI's Vice President Ming Shin Kou ("Kou") and GE Capital Senior Vice President Robert Brichacek ("Brichacek").  *Id.* ¶¶ 11, 30.  By May 9, 2014, the parties' negotiations were sufficiently advanced that Brichacek sent to Kou and his team an email titled "[OFI]-Contessa P[urchase] P[rice] Analysis."  Declaration of Robert Brichacek in Support of Defendant GE Capital's

---

[1]     The facts are taken from the FAC.  The Court assumes all facts alleged in the FAC are true, *see Galper v. JP Morgan Chase Bank*, N.A., 802 F.3d 437, 442 (2d Cir. 2015).

[2]     The FAC does not specify the precise date on which GE Capital and OFI first discussed the transaction.

Motion to Dismiss the First Amended Complaint, Dkt. 56 ("Brichacek Decl.") Ex. C.[3]

Brichacek's email included a "purchase price analysis based on data from [GE Capital's] May 6, 2014 borrowing base." *Id.* Ex. C.  Brichacek acknowledged that the "final purchase price remain[ed] a moving target" and indicated that the sale agreement would "contain the appropriate purchase price adjustment mechanics to capture changes in the value of the working capital assets up to the date of sale." *Id.*; FAC ¶ 11.  Also on May 9, 2014, a DSI employee, Steven L. Victor ("Victor"), sent Kou and the OFI team "detail reports" of Contessa's accounts.  Brichacek Decl. Ex. D; FAC ¶¶ 29, 50.  Victor explained that the detail reports were intended for "detailed diligence" and would also facilitate a "prompt calculation of value" and "post-closing adjustments."  Brichacek Decl. Ex. D; FAC ¶¶ 29, 50.  According to Victor, the detail reports had been prepared earlier that day and were "very current." *Id.*  Based on the detail reports, Victor estimated the "Lot Actual Value" of Contessa's inventory to be $16,021,912.60 and the "total gross accounts receivable" to be $6,398,895. *Id.*  The FAC alleges that the purchase price for the Contessa assets was based primarily on these emails.  FAC ¶¶ 43, 54.

Although the May 9 emails reference "post-closing adjustments" and an "appropriate purchase price adjustment [mechanism]," neither the APA (between OFI and DSI) nor the Credit Agreement (between OFI and GE Capital) includes such provisions.  Quite the contrary, the APA provides that the sale to OFI is on an "'as-is, where-is'" basis, FAC Ex. 2 (APA) § 6.1, and is "without representation or warranty of any kind," *id.* § 4.4.  Section 6.1 of the APA further provides a disclaimer by the Seller (DSI) of any warranties regarding the "nature, quality . . . or

---

[3]    The FAC quotes extensively from the May 9, 2014 emails between the parties.  Complete copies of the emails were attached to the Brichacek Declaration as exhibits C and D.  The Court considers this correspondence to be incorporated by reference into the FAC.  *See Harris v. AmTrust Fin. Servs., Inc.*, 135 F. Supp. 3d 155, 160 n.4 (S.D.N.Y. 2015) (citing *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)).

condition of the Purchased Assets" and includes an acknowledgment by the Buyer (OFI) that it is relying

> solely on its own investigation and not on any information provided or to be provided by any other Party . . . [and] that no independent investigation or verification has been or will be made by [DSI] with respect to any information supplied by [DSI] concerning the Purchased Assets . . . it being intended by the parties that [OFI] shall verify the accuracy and completeness of such information itself.

*Id.* § 6.1.

Similarly, the Credit Agreement includes a broad release between OFI and GE Capital and does not mention "post-closing adjustments" and does not include any mechanism to adjust the purchase price OFI paid to DSI.  The release contained in the Credit Agreement applies to "any and all claims . . . at law or in equity in respect of all prior discussions and understandings, oral or written, relating to the subject matter of [the Credit Agreement] and the other Loan Documents."  FAC Ex. 1 (Credit Agreement) § 9.20(b).  The Credit Agreement also includes a "merger clause" providing that it "embod[ies] the entire agreement of the parties."  *Id.* § 9.20(a).

After closing, OFI undertook an audit and "physical due diligence review and analysis of the Contessa assets," including inventory and accounts receivable.  FAC ¶ 14.  Illustrating why due diligence is best done prior to a closing, OFI alleges that its audit uncovered substantial discrepancies between the inventory and accounts receivables figures reported in the purchase price analysis and detail reports provided by DSI and GE Capital on May 9, 2014, and the actual value of the Contessa assets.  *Id.* ¶ 15.  After uncovering these alleged discrepancies, Kou insisted that GE Capital make a "post-closing adjustment" to the price; GE Capital refused.  *Id.* ¶¶ 51, 53.

## II.    The FAC's Allegations of Fraud, Negligent Misrepresentation, and Unfair Competition and Trade Practices

The FAC alleges that the purchase price analysis and detail reports provided by GE Capital and DSI included several misrepresentations regarding the caliber and value of the Contessa assets, causing OFI significantly to overpay.  FAC ¶¶ 57, 62.  OFI also alleges that GE Capital concealed these misrepresentations by using its control of the sale process and its past relationship with OFI to thwart OFI's attempts to conduct due diligence into the value of the Contessa assets.  FAC ¶¶ 39-40.  Based on these allegations—described in more detail below— OFI brings five claims under New York common law for fraudulent misrepresentation, negligent misrepresentation, actual fraud, fraudulent inducement, and constructive fraud, and two statutory claims for deceptive acts or business practices pursuant to New York General Business Law Section 349 and for unfair competition pursuant to California Business & Professions Code Section 17200.  *Id.* ¶¶ 56-121.[4]

The FAC alleges that GE Capital intentionally manipulated the value of Contessa's accounts receivable.  FAC ¶ 37.  According to OFI, Brichacek and his team intentionally removed from the May 9 purchase price analysis sent to Kou a "dilution percentage" that was typically applied by GE Capital to the Contessa accounts receivable.  *Id.* ¶¶ 37, 43.  By removing the dilution percentage, GE Capital overstated the value of the accounts receivable by "no less than $543,578."  *Id.* ¶ 44.  The FAC also alleges that Victor's May 9 follow-up email misrepresented the value of Contessa's inventory by approximately $4.6 million by including inventory that could no longer be sold.  *Id.* ¶¶ 48-50.  Because GE Capital audited Contessa "nearly monthly," OFI alleges that it "knew full well" that Contessa's inventory reports

---

[4]         The parties do not dispute that the New York choice-of-law provision of the Credit Agreement applies to this action.  *See* Def.'s Mem. 14.

significantly overstated the value of its inventory; OFI alleges that GE Capital directed DSI to send OFI inaccurate information.  *Id.* ¶¶ 29, 47-52, 58.

Apparently in an attempt to shoehorn itself into the law governing "special relationships," *see* Discussion Part I.B. *infra*, the FAC also alleges that GE Capital took advantage of the longstanding business relationship between Kou, Brichacek, and others at GE Capital and its control of the sale process to conceal its deceptions.  According to the FAC, OFI had no reason to doubt GE Capital's representations regarding the value of the Contessa assets because they had done "countless deals in the past."  FAC ¶ 25.  The FAC also alleges that Kou "considers Hasenbalg [Brichacek's boss] a personal friend," and had previously received a commission from GE Capital for facilitating another credit transaction.  *Id.*  GE Capital is also alleged to have insisted on a "rapid" pace and made clear that "no deal would happen" if it did not happen "within the time demanded by GE Capital," giving OFI little opportunity independently to investigate the Contessa records.  *Id.* ¶ 28.  Because GE Capital "enjoyed and exclusively controlled critical access" to all of Contessa's assets, "OFI's capacity to review [Contessa's] financial and business records was entirely limited to whatever access GE Capital extended" during the parties' negotiations.  *Id.* ¶ 40.  According to the FAC, GE Capital also used its control of the process and relationship to OFI to convince Kou to finance the transaction through GE Capital, preventing any additional scrutiny of the deal by another financing bank.  *Id.* ¶¶ 25-26.

Finally, the FAC alleges that GE Capital induced OFI to agree to the terms of the APA and Credit Agreement—including the broad releases and disclaimers therein—by falsely promising to make post-closing adjustments to the purchase price.  FAC ¶¶ 28-34, 39. Recognizing that it was relying on the veracity of GE Capital's representations and the accuracy

of the documents provided by GE Capital and DSI, OFI contends that it only agreed to the allocation of risk in the documents because "GE Capital offered the separate and independent promise to perform post-closing adjustments and reconciliation as to any discrepancies discovered in [the] value[s] [of the Contessa assets]." *Id.* ¶ 28.  The FAC alleges that this "separate and independent promise" was "regularly recognized and confirmed" by GE Capital and OFI in "verbal conversations just days before executing the closing documents" and is further evidenced by the May 9, 2014, emails from Victor and Brichacek, which mention including a provision allowing for post-closing adjustments in the APA.  *Id.* ¶¶ 11, 29.

## III.   Procedural History

OFI filed its complaint on May 11, 2015, in the Central District of California.  Dkt. 1. On June 24, 2015, GE Capital moved to dismiss or, in the alternative, to transfer the case to this Court.  Dkt. 25.  On September 10, 2015, the assigned judge in the Central District of California granted GE Capital's motion to transfer.  Dkt. 38.  This Court granted OFI's request for leave to amend its complaint on October 16, 2015, Dkt. 50, and OFI filed the FAC on November 23, 2015.  Thereafter, GE Capital renewed its Motion to Dismiss.  Dkt. 54.  Subject-matter jurisdiction exists pursuant to 28 U.S.C. § 1332.

## DISCUSSION

"To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint must allege sufficient facts, taken as true, to state a plausible claim for relief." *Johnson v. Priceline.com, Inc.,* 711 F.3d 271, 275 (2d Cir. 2013) (citing *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555-56 (2007)); *see also Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *N.J. Carpenters Health Fund v. Royal*

*Bank of Scot. Grp., PLC,* 709 F.3d 109, 120 (2d Cir. 2013) (quoting *Iqbal,* 556 U.S. at 678).  In

deciding a motion to dismiss, courts must "accept all allegations in the complaint as true and

draw all inferences in the non-moving party's favor."  *L.C. v. LeFrak Org., Inc.,* 987 F. Supp. 2d

391, 398 (S.D.N.Y. 2013) (quoting *LaFaro v. N.Y. Cardiothoracic Grp., PLLC,* 570 F.3d 471,

475 (2d Cir. 2009)).  Although, ordinarily, the Court may consider only information within the

four corners of the complaint, the Court may also consider any materials attached to the

complaint and "statements or documents that are incorporated into the [complaint] by reference."

*See Harris,* 135 F. Supp. 3d at 160 n.4 (citing *ATSI Commc'ns,* 493 F.3d at 98).

A heightened pleading standard applies to claims sounding in fraud:  "In alleging fraud or

mistake, a party must state with particularity the circumstances constituting fraud or mistake.

Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."

Fed. R. Civ. P. 9(b).  To plead the circumstances constituting fraud with particularity, the

complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2)

identify the speaker, (3) state where and when the statements were made, and (4) explain why the

statements were fraudulent." *Lerner v. Fleet Bank, N.A.,* 459 F.3d 273, 290 (2d Cir. 2006)

(quoting *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1175 (2d Cir. 1993)).  To plead malice,

intent, or knowledge "generally" means that "'the general 'short and plain statement of the

claim' mandate in Rule 8(a) . . . should control the second sentence of Rule 9(b).'"  *Iqbal,* 556

U.S. at 687 (quoting 5A Wright & Miller, Federal Practice and Procedure § 1301, at 291 (3d ed.

2004)).  But "'generally' is not the equivalent of conclusorily . . . [P]laintiffs must still plead the

events which they claim give rise to an inference of [malice, intent, or] knowledge" to satisfy the

Rule 8(a) pleading standard.  *Krys v. Pigott,* 749 F.3d 117, 129 (2d Cir. 2014) (citations and

internal quotation marks omitted).

# I.     OFI's Fraud Claims Are Barred by the Terms of the Parties' Agreements

## A.     *The Credit Agreement Releases OFI's Claims*

GE Capital argues that the broad release contained in the Credit Agreement precludes this lawsuit.  Def.'s Mem. at 14-16.  OFI does not dispute that its claims are within the scope of the release but argues that the release is inapplicable because it is the product of a "separate fraud": GE Capital's false promise to make post-closing price adjustments.  Pl.'s Mem. at 5-9; FAC ¶¶ 28-34.  OFI's theory depends on the Court drawing an artificial distinction between the promise in the May 9 emails that the APA would include a post-closing price adjustment that OFI contends led it to agree to the release, and other statements, in the very same emails, that OFI contends are the fraudulent statements on which it detrimentally relied.  The FAC itself describes these terms together, with the promise of a post-closing price adjustment serving as a hedge against the purchase price and OFI's related assumption of risk in the Credit Agreement and APA.  FAC ¶¶ 28, 55.

New York law permits a party to release unknown claims, including unknown fraud claims, so long as the release is intentional and fairly made.  *See Centro Empresarial Cempresa S.A. v. Am. Movil, S.A.B. de C.V.*, 17 N.Y.3d 269, 276 (2011).  If a defendant establishes that a release applies to a plaintiff's claims, the burden shifts to plaintiff to "'show that there has been fraud, duress or some other fact which will be sufficient to void the release.'"  *Id.* (quoting *Fleming v. Ponziani*, 24 N.Y.2d 105, 111 (1969)).  This exception, known as the "separate fraud" exception, necessarily follows from the rule that a release of claims must be intentional and fairly made.  New York courts construe this exception narrowly, however, to avoid "convert[ing] [a release] into a starting point for litigation except under circumstances and under rules which would render any other result a grave injustice."  *Morefun Co. v. Mario Badescu Skin Care Inc.*,

No. 13-cv-9036 (LGS), 2014 WL 2560608, at *5 (S.D.N.Y. June 6, 2014) (quoting *Centro*, 17 N.Y.3d at 276).

In order to allege a separate fraud, a plaintiff must identify some fraudulent act that is "separate from the subject of the release" itself, *JFK Hotel Owner, LLC v. Hilton Hotels Corp.*, 986 N.Y.S.2d 866 (Sup. Ct. 2014) (quoting *Centro*, 17 N.Y.3d at 276); *see also Bd. of Managers of NV 101 N 5th St. Condo. v. Morton*, 975 N.Y.S.2d 365 (Sup. Ct. 2013) (rejecting separate fraud where release was "broad enough to encompass plaintiff's claims that it was fraudulently induced"), and also plausibly allege each of the elements of a fraud claim based on that purportedly separate act, *see Engel v. Deutsche Bank Nat. Trust Co.*, 983 N.Y.S.2d 630, 632 (2d Dep't 2014) (plaintiffs did not adequately plead reliance element of separate fraud); *Centro*, 17 N.Y.3d at 276 (explaining necessary elements of a claim of fraudulent inducement).

GE Capital's alleged promise to make a post-closing purchase price adjustment is not a fraud "separate from the subject of the release." *JFK Hotel*, 986 N.Y.S.2d at 866. The Credit Agreement release applies to "any and all claims" "relating to the subject matter of [the Credit Agreement]." FAC Ex. 1 (Credit Agreement) § 9.20(b). OFI does not dispute that the purchase of the Contessa assets is part of the "subject matter" of the Credit Agreement. Indeed, OFI's entire claim is premised on the Credit Agreement being essentially inseparable from the APA, in as much as its desired-for adjustment to the purchase price would have to have been made in the APA, not in the Credit Agreement. The Credit Agreement itself states that its purpose is to "fund a portion of the purchase price of the acquisition . . . of certain assets of [Contessa]." *Id.* at 1; *see also id.* § 2.1(k) ("Closing Date Acquisition"). Nor can OFI dispute that the promise of a post-closing purchase price adjustment relates to the sale and to the Credit Agreement; that is precisely what the FAC alleges: "OFI only signed the Credit Agreement . . . with the sense of

assurance that GE Capital's separate and independent promise would protect OFI against the terms of the Credit Agreement."  FAC ¶ 28.

As the FAC makes clear, GE Capital's alleged misrepresentations are interrelated elements of one large transaction that included a purchase and financing for that purchase.  As OFI explains, the "post-closing adjustment" was OFI's "demanded 'out' from the [APA], because OFI was assured [that] if any values were incorrect, they would be corrected by GE Capital['s] post-closing [price adjustment]."  *Id.* ¶ 55.  In other words, at the same time as DSI and OFI were negotiating the price of the Contessa assets "as-is, where-is" based on allegedly false documents, GE Capital was also promising to make a post-closing price adjustment that would effectively reverse that allocation of risk.  Both of these allegedly "separate" misrepresentations relate to the price of the Contessa assets and the reliability of the records used to support the parties' pricing analysis.  The Credit Agreement release is part of this single transaction and its release is of a piece with the "as-is, where-is" terms of the deal.  Moreover, the emails that evidence GE Capital's promise of a post-closing adjustment are the same emails in which OFI, GE Capital, and DSI negotiated the terms of the Contessa purchase.  *See* Brichacek Decl. Ex. C ("The asset purchase agreement will contain the appropriate purchase price adjustment mechanics to capture changes in the value of the working capital assets"); Brichacek Decl. Ex. D ("Using these [detail reports] will allow for a prompt calculation of value and for post-closing adjustments.").  OFI has alleged no facts from which a reasonable fact-finder could conclude that GE Capital's promise that the APA would include a post-closing price adjustment was separate from its purported manipulation of the materials used by DSI, OFI, and GE Capital to determine the purchase price in the first place.

Finally, assuming that GE Capital's promise was a "separate fraud," OFI has not plausibly pled the elements of a claim for fraudulent inducement. *See Engel*, 983 N.Y.S.2d at 632. In order to state a claim for fraudulent inducement, a plaintiff must allege: "the basic elements of fraud, namely a representation of material fact, the falsity of that representation, knowledge by the party who made the representation that it was false when made, justifiable reliance by the plaintiff, and resulting injury." *Centro*, 17 N.Y.3d at 276 (quoting *Global Minerals and Metals Corp. v. Holme*, 824 N.Y.S. 2d 210 (1st Dep't. 2006)). While the May 9 emails clearly reference a "post-closing adjustment," they do not reference an extra-contractual promise to make such an adjustment. In fact, Brichacek's mention of an adjustment is in reference to what would be contained in the APA itself. Brichacek Decl. Ex. C ("[t]he [APA] will contain the appropriate purchase price adjustment mechanics"). Assuming that some separate promise of a post-closing adjustment was made orally, as the FAC alleges, FAC ¶ 29, those oral promises are not pleaded with the specificity required for allegations of fraud by Rule 9(b). The FAC does not allege who made such an oral promise, to whom the promise was made, when it was made or what specifically was promised. *See Lerner,* 459 F.3d at 290 (Rule 9(b) requires plaintiff to identify the fraudulent statements, the speaker, "where and when" statements were made, and explain why there were fraudulent (quoting *Mills*, 12 F.3d at 1175)).

B.     *The Disclaimer in the APA Also Forecloses OFI's Common Law Tort Claims*

While the release provision of the Credit Agreement bars OFI's fraud claims against GE Capital, the Court also finds that OFI has not plausibly alleged necessary elements of its common law tort causes of action. OFI alleges five causes of action, including fraudulent misrepresentation, negligent misrepresentation, actual fraud, fraudulent inducement, and constructive fraud. Though the elements of each of these causes of action differ, the parties

agree that reasonable reliance is a necessary element of each claim.  *Compare* Def.'s Mem. at 17, *with* Pl.'s Mem. at 11-14 *and* FAC ¶¶ 60, 69, 79, 88, 98 (pleading reasonable reliance with respect to each tort claim).  OFI's argument that it reasonably relied on the allegedly inaccurate inventory reports and purchase price analysis provided by GE Capital is foreclosed by the specific disclaimer of reliance in the APA, in which OFI agreed that it was relying "solely on its own investigation and not any information provided or to be provided by any other Party."  FAC Ex. 2 (APA) § 6.1.  Accordingly, even if the release in the Credit Agreement did not apply to OFI's claims, the Court would dismiss the FAC for failing plausibly to allege reliance.

Under New York law, a sufficiently specific contractual disclaimer bars a plaintiff from alleging reliance on matters within the scope of the disclaimer.  *See Warner Theatre Assocs. Ltd.*, *v. Metro. Life Ins. Co.*, 149 F.3d 134, 136 (2d Cir. 1998) (citing *Danann Realty Corp. v. Harris,* 5 N.Y.2d 317 (1959)).  OFI appears to argue that a narrow exception to this rule, for matters peculiarly within one party's knowledge, should apply here.  Pl.'s Mem. at 12-13.  The "peculiar knowledge" exception applies when a party takes reasonable steps to verify its counterparty's statements but is unable to do so because the underlying information is impractically expensive to obtain or solely within the control of the counterparty.  *See Psenicska v. Twentieth Century Fox Film Corp.*, 409 F. App'x 368, 371 (2d Cir. 2009).  This exception is stringently applied "when the contracting parties are 'sophisticated entities'" and does not apply "where the plaintiff had a low cost alternative such as 'insisting that the written contract terms reflect any oral undertaking on a deal-breaking issue.'"  *Sol Grp. Mktg. Co. v.* Lines, No. 14-cv-9929 (SHS), 2016 WL 205444, at *5 (S.D.N.Y. Jan. 15, 2016) (quoting *Bibeault v. Advanced Health Corp.*, No. 97-cv-6026 (WHP), 2002 WL 24305, at *5 (Jan. 8 2002)) (additional citations omitted); *see also Lazard Freres & Co. v. Protective Life Ins. Co.*, 108 F.3d 1531, 1543 (2d Cir. 1997)

(peculiar knowledge exception does not apply where plaintiff was aware of risk and did not

bargain for protection).

The "peculiar knowledge" exception does not apply here.  As the Second Circuit

explained in *Lazard Freres*, a sophisticated entity engaging in a significant transaction may not

rely on the peculiar knowledge exception when it could have bargained for contractual protection

but chose not to do so.  *Lazard Freres*, 108 F.3d at 1543.  *Lazard Freres* is on all-fours with this

case.  The FAC alleges that OFI was aware of the risk that the detail reports and accounts

receivable records received from DSI were inaccurate:  "[b]oth GE Capital and OFI realized,

with the rapid pace demanded by GE Capital, OFI would not be able to physically inspect,

investigate, verify, and review all affirmative representations made by GE Capital."  FAC ¶ 28.

Despite the existence of a merger clause, OFI alleges that it protected itself from this risk

through GE Capital's extra-contractual promise of a purchase price adjustment and chose not to

insist that the promised purchase price adjustment mechanism be memorialized in the APA or

Credit Agreement:  "OFI only agreed to this abnormally rapid closing because GE Capital

offered the separate and independent promise to perform post-closing adjustments," *id.*; "[t]his

was OFI's demanded 'out' from the contract, because OFI was assured if any values were

incorrect, they would be corrected by GE Capital post-closing," *id.* ¶ 55.  OFI could have, but did

not, insist that GE Capital memorialize its promise.  *See Warner Theatre Assocs. Ltd. P'Ship.*,

149 F.3d at 136 ("insist[ing] that the written contract terms reflect any oral undertaking" is a

low-cost alternative).  The fact that GE Capital had represented to OFI that the APA would

include just such a purchase-price adjustment mechanism makes OFI's reliance on an oral

promise especially unreasonable.[5]

In response, OFI argues that *Lazard Freres* should not apply at the pleading stage, or at

least not when it alleges that the parties had a "special relationship" and that its attempts at due

diligence were "thwarted" by GE Capital.  *See* Pl.'s Mem. 11-16.  The Second Circuit has made

clear that the Court may address this issue on a Rule 12(b)(6) motion:  "although in *Lazard*

*Freres* we were reviewing a grant of summary judgment rather than a dismissal at the pleadings

stage, this distinction is without a difference in the case at hand, as our ruling is based solely on

the allegations contained in the [complaint] and [operative agreements]."  *Emergent Capital Inv.*

*Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 196 (2d Cir. 2003).  OFI's argument that its

attempts at due diligence were thwarted is also unavailing.  In *Allied Irish Banks P.L.C. v. Bank*

*of Am., N.A.*, the primary case cited by OFI, the plaintiff was not on notice of the possibility that

the materials on which it relied were inaccurate, nor did it attempt to allocate that risk through an

extra-contractual promise that contradicted the plain language of the parties' agreement.  No. 03-

cv-3478 (DAB)*, 2006 WL 278138, at *9 (S.D.N.Y. Feb. 2, 2006).  And, finally, OFI has not

plausibly alleged a "special relationship" between GE Capital and OFI.  OFI points to GE

Capital's requirement that it sign a non-disclosure agreement ("NDA"), Pl.'s Mem. at 19-21, but

the NDA signed by OFI and DSI did not transform the parties into fiduciaries.  *See IP Cube*

*Partners Co. v. Telecomm. Sys., Inc.*, No. 15-cv-6334 (LTS), 2016 WL 3248500, at *4 (S.D.N.Y.

June 13, 2016).  The FAC's other allegations establish only that OFI and GE Capital had a

history of business dealings, FAC ¶¶ 30-32, 41, and that Kou and Hasenbalg were personally

---

[5]      It is also doubtful that the FAC adequately alleges reliance by OFI.  The theory of the FAC is that OFI relied on GE Capital's promise to make a purchase price adjustment, not that OFI relied on the accuracy of the detail reports and accounts receivable reported by DSI.

friendly, *id.*¶ 25.  None of that adds up to a "special relationship" under controlling law.  *See*

*Emergent Capital*, 343 F.3d at 196 (rejecting argument that personal friendship rendered reliance

on extra-contractual promises reasonable).

In sum, OFI has not plausibly alleged any grounds on which the Court could invalidate

either the Credit Agreement release or the APA disclaimer.  Because of the overlapping nature of

GE Capital's alleged misrepresentations, all relating to the price OFI would pay for the Contessa

assets, OFI has not alleged a "separate fraud" that might invalidate the Credit Agreement release.

But even if OFI had done so, the APA also bars these claims.  OFI cannot reasonably rely on

documents provided to it by GE Capital in the face of a contractual provision expressly

disclaiming reliance on materials provided by any other party.

## II.    The FAC Does Not State a Claim for Unfair Competition or Deceptive Acts

In addition to its common law tort claims, OFI asserts claims for unfair competition

under California Business & Professions Code Section 17200 and deceptive acts under New

York General Business Law Section 349.  Neither statute provides a cause of action for

sophisticated entities, like OFI and GE Capital, engaging in purely private commercial

transactions.

Section 17200, California's Unfair Competition Law ("UCL"), provides a remedy for

injuries to the public and individual consumers.  *See Dollar Tree Stores, Inc. v. Toyama Partners*

*LLC*, 875 F. Supp. 2d 1058, 1083 (N.D. Cal. 2012) (citing *Linear Tech. Corp. v. Applied*

*Materials, Inc.*, 152 Cal. App. 4th 115, 135 (Cal. Ct. App. 2007)).  The UCL does not reach

claims based on bilateral contracts between commercial entities capable of protecting their own

interests.  *See Linear Tech. Corp.*, 152 Cal. App. 4th at 135 (quoting *Rosenbluth Int'l., Inc. v.*

*Superior Court*, 101 Cal. App. 4th 1073, 1078 (Cal. Ct. App. 2002)).  OFI has not alleged any

injury other than in its capacity as a counterparty to GE Capital and DSI in connection with the financing and purchase of the Contessa assets.  Nor does OFI allege that GE Capital and DSI's conduct harmed any class of similarly-situated businesses.  *See In re Yahoo! Litig.*, 251 F.R.D. 459, 474-75 (C.D. Cal. 2008) (corporate plaintiff may bring unfair competition claim on behalf of class of businesses injured by vendor's promise of "highly targeted" advertising).

Likewise, Section 349 of the New York General Business Law provides a remedy for deceptive acts that are directed at the consuming public, not deception in bilateral contractual relationships among sophisticated parties.  *See Wilson v. Nw. Mut. Ins. Co.*, 625 F.3d 54, 64 (2d Cir. 2010) (Section 349 applies to "consumer-oriented" conduct).  "Courts in New York have held repeatedly that a 'single shot transaction' involving complex arrangements, knowledgeable and experienced parties and large sums of money is not a 'consumer oriented' transaction for purposes of [Section 349] claims."  *4 K & D Corp. v. Concierge Auctions, LLC*, 2 F. Supp. 3d 525, 548 (S.D.N.Y. 2014) (quoting *Genesco Entm't v. Koch,* 593 F. Supp. 743, 752 (S.D.N.Y.1984)) (internal quotation marks omitted).  Section 349 does not apply to OFI's claims that GE Capital defrauded it in the context of a multi-million dollar asset purchase.

In short, regardless of the release, OFI has not stated a claim under either the California UCL or under Section 349 of the New York General Business Law.

## III.    Leave to Amend

Under Rule 15(a) of the Federal Rules of Civil Procedure, "[t]he court should freely give leave" to a party to amend its complaint "when justice so requires."  Fed. R. Civ. P. 15(a)(2).  "Leave may be denied 'for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party.'"  *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014) (quoting *McCarthy v. Dun & Bradstreet Corp.,* 482 F.3d 184, 200 (2d Cir. 2007)

(other citation omitted)).  Ultimately, "the grant or denial of an opportunity to amend is within the discretion of the District Court."  *Foman v. Davis,* 371 U.S. 178, 182 (1962).

It seems highly likely that leave to amend will be futile in this case.  As explained *supra* the contractual agreements among the parties bar each of Plaintiff's causes of action.  OFI has not provided any indication that there are additional extant facts that would support its "separate fraud" argument or render inoperative the specific disclaimer in the APA.  Although OFI requests leave to amend, it has not provided a proposed amendment for the court to review.  Nevertheless, Plaintiff shall have 14 days from the filing of this Opinion to show good cause why leave to file a Second Amended Complaint should be granted.

## CONCLUSION

For the foregoing reasons, GE Capital's Motion to Dismiss is GRANTED.  The Clerk of Court is respectfully directed to close the open motion at docket number 54.  Plaintiff's deadline to show good cause why leave to replead should be granted is October 10, 2016.

**SO ORDERED.**

Date:  **September 26, 2016**                                    **VALERIE CAPRONI**
         **New York, New York**                                 **United States District Judge**

18